**In re Marshall Eugene QUINN, SSN: 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, Debtor.**

**Andrea Quinn SHANNON and Tracy Quinn, Plaintiffs,**

**v.**

**Marshall Eugene QUINN, Defendant.**

**Bankruptcy No. C-B-87-693.**
**Adv. No. 87-0212.**

United States Bankruptcy Court,
W.D. North Carolina,
Charlotte Division.

Dec. 14, 1988.

Fred Hicks of Tucker, Hicks, Hodge and Cranford, Charlotte, N.C., for plaintiffs.

Craig Whitley of Leonard, McNeely, MacMillan & Durham, Charlotte, N.C., for defendant.

MARVIN R. WOOTEN, Bankruptcy Judge.

This matter came on to be heard for a bench trial to determine whether the defendant's obligations to his former spouse are excepted from the defendant's Chapter 7 discharge under 11 U.S.C. § 523(a)(5)(B). After reviewing the record and hearing the arguments of counsel, the court, pursuant to Bankruptcy Rule 7052, makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

Plaintiff Andrea Quinn (hereinafter Mrs. Shannon) and defendant Marshall Quinn were married in April, 1977. Shortly thereafter, Marshall Quinn adopted plaintiff, Tracy Quinn, Andrea Shannon's daughter from a prior marriage.

Over the course of the marriage, the relationship deteriorated and the parties ultimately separated for the last time in May of 1984 and divorced on October 2, 1986. The plaintiff, Andrea Shannon initially retained attorney Nelson M. Casstevens, Jr. and later Mr. David Kern to represent her in resolving the claims arising out of the marital relationship. Although there were numerous attempts to settle the matters between the parties, they were unsuccessful and on June 6, 1986, Mrs. Shannon filed an action in the Mecklenburg County District Court alleging an entitlement to alimony pendente lite, permanent alimony, child custody, child support and attorney's fees.

As a basis for the entitlement to recover alimony, the plaintiff alleged that the de-

fendant (1) had engaged in an unnatural or abnormal sex act with the minor child Tracy; (2) had constructively abandoned the plaintiff and the minor child; (3) had maliciously turned the plaintiff and minor out of doors; (4) had offered indignities to the plaintiff; (5) had willfully failed to provide plaintiff with the necessary subsistence according to his means and ability.

The alimony hearing was scheduled on October 2, 1986, in Mecklenburg County District Court. Mr. Kern had prepared to try the matter, but also had prepared a contract of separation which the parties ultimately signed on October 2, 1986. The agreement was executed by the parties in the presence of their attorneys and a notary in a room adjacent to the courtroom. After the contract was signed and in accordance with the terms of the agreement, Mr. Kern dismissed the alimony and child support action.

After the parties separated in May, 1984, but before the final agreement was signed in October, 1986, the parties made many attempts to negotiate a settlement. At the trial, the plaintiffs produced several letters and proposals that went back and forth between the parties during this time. In one letter, written on June 10, 1985, from Mr. Quinn to Mrs. Shannon, Mr. Quinn wrote to Mrs. Shannon, "I will pay to you $1,000.00 per month *alimony* as long as you don't remarry thru June, 1992, when I reach 62. This $1,000.00 will be free of all taxes," and "I will pay $250.00 per month child support for Tracy as long as she conti[nues] her education." (emphasis added) (Plaintiff's Exhibit # 21).

Another letter dated September 23, 1986, from Mrs. Shannon to Mr. Quinn, stated that Mr. Quinn was to pay $500 a month *alimony* tax free starting the first day of October, 1986. The payments were to be made until Mr. Quinn retired regardless of her status. (emphasis added) (Plaintiff's Exhibit # 8). In a letter dated September 25, 1986, from Mr. Quinn to his attorney, Mr. Tom Cannon, Quinn wrote in reference to the above term, "Agreed."

On June 13, 1986, Mr. Tom Cannon, wrote a letter to Mr. Kern setting forth a number of items which he contended were in dispute and offered, "[i]n order to resolve the controversy, Mr. Quinn will pay his wife $500 per month as *permanent alimony*, together with lump sum payments of $3,000 on July 1, 1986, and on July 1, 1987." (emphasis added) (Plaintiff's Exhibit # 6).

The agreement that the parties signed on October 2, 1986, in the Mecklenburg County Courthouse does not use the term "alimony" or "support" but reads as follows:

PAYMENTS TO WIFE:

A. Effective with the month of October, 1986 Husband shall pay directly to Wife, the cash sum of $500.00 per month due and payable on the first day of each month. Such payments shall continue until the first of the following events:

a) Husband's death;

b) The arrival of October 1, 1994;

c) Wife's death.

B. On or before May 15, 1987 Husband shall deliver to Wife cash or certified funds in the amount of $5,000.00.

C. The parties agree that the cash payments described above shall not be considered alimony and shall not, for tax purposes, be deductible by Husband or reported as income by Wife. On the contrary, the payments provided herein shall be considered as payments in settlement of property rights. The amounts provided herein shall not be subject to modification by way of increase or decrease, notwithstanding a change of circumstances or condition of either or both parties.... (Plaintiff's Exhibit # 11).

The agreement also contained a provision that Mr. Quinn would transfer title and possession of the Cadillac to Mrs. Shannon and that he would pay all insurance, monthly payments, taxes and other expenses until the note is paid in full. The same type provision was made with respect to Tracy's car. Mr. Quinn also agreed to pay $100.00 per month to Tracy for college expenses and these would continue "for the time necessary for Tracy to complete the course of study which she has undertaken, not to exceed four (4) years." (Plaintiff's Exhibit # 11).

The plaintiff, Tracy Quinn was enrolled at Louisburg College in Louisburg, North Carolina as of the date of the agreement. However, she withdrew from Louisburg in the Fall of 1987.

After the parties executed the contract, Mr. Quinn made the payments as called for under the terms of the agreement until June 1987, at which time the defendant refused to make further payments, filed bankruptcy and asserted therein that the payments required under the agreement were part of a property settlement and therefore dischargeable in bankruptcy.

## DISCUSSION AND CONCLUSIONS OF LAW

I. Mr. Quinn's Obligation to Andrea Shannon

A. *The Burden and Standard of Proof.*

At a trial on a complaint objecting to a discharge, the plaintiff has the burden of proving his objection. Bankruptcy Rule 4005; *In re Long,* 794 F.2d 928, 930 (4th Cir.1986). In a recent opinion involving an objection to discharge, based on the contention that the payments were alimony, the Fourth Circuit stated that,

"the analysis of dischargeability under Section 523 must begin with the assumption that dischargeability is favored under the Code unless the complaining spouse, who has the burden of proof, demonstrates that the obligation is actually in the nature of alimony, maintenance or support."

*Tilley v. Jessee,* 789 F.2d 1074, 14 C.B. C.2d, 1376, 1379 (4th Cir.1986). Because the plaintiff has to overcome the presumption of dischargeability, it would seem that the standard of proof in § 523 cases would be higher than the normal "preponderance of the evidence" standard. However, the Fourth Circuit declined to adopt the higher standard of "clear and convincing evidence" in an opinion involving 523(a)(6), despite the many cases which hold that standard as the appropriate one. Noting that the Bankruptcy Code is silent as to the standard of proof necessary to establish exceptions to a discharge in § 523, the Fourth Circuit applied the preponderance of the evidence standard. *Combs v. Richardson,* 838 F.2d 112 (4th Cir.1988).

Nevertheless, in the present case, the court finds that it is clearly convinced that the parties intended the payments as alimony. Thus, whether the standard of proof is clear and convincing or a preponderance of the evidence, this court concludes that the plaintiff has proved her case and the debt is therefore non-dischargeable.

B. *The Court is Allowed to Look Beyond the Parties Final Agreement in Order to Determine the Intent of the Parties.*

The Bankruptcy Reform Act of 1978 as amended, Section 523(a) Exceptions to Discharge provides that a discharge of debts under the Act does not discharge any debt:

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with state or territorial law by a governmental unit, or property settlement agreement, but not to the extent that . . .

(B) such debt includes a liability designated as alimony, maintenance or support . . .

11 U.S.C. § 523(a)(5)(B). The issue for the court to decide is whether Marshall Quinn's obligation to make certain payments to his former wife pursuant to their agreement "is actually in the nature of alimony, maintenance or support." The determination of whether alimony is for the recipient's maintenance and support for purposes of a bankruptcy dischargeability is a matter of federal and not state law. *In re Long,* 794 F.2d 928 (4th Cir.1986) and *see Shaver v. Shaver,* 736 F.2d 1314, 1316 (9th Cir.1984).

In an opinion decided under the 1898 Bankruptcy Act, the Fourth Circuit set out the federal standard used to ascertain whether an obligation to a former spouse is

alimony or a property settlement. In *Melichar v. Ost*, 661 F.2d 300 (4th Cir.1981), Theodore Melichar and his former wife, now Mrs. Ost, executed a settlement agreement in which Mr. Melichar was to pay $66,550 in monthly installments of $550 for a period of 121 months. In the event of Mrs. Melichar's remarriage, Mr. Melichar's liability for further payments would end after 108 months and in the event of the death of either party, liability for further payments would abate. *Id.* at 301–302.

The Court of Appeals agreed with the district court judge and found that the agreement contained elements of both a straight property settlement and an alimony agreement. The court noted that the hybrid nature of the agreement does not automatically destroy the nature of the payments as alimony. *Id.* at 303. The court concluded that "the proper test of whether the payments are alimony lies in the proof of whether it was the intention of the parties that the payments are for support rather than a property settlement." *Id.* Thus, *Melichar* holds that when an agreement to pay a former spouse contains elements of both a property settlement and alimony payments, the court must look beyond that agreement and determine the intent of the parties at the time the agreement was made.

Another Fourth Circuit opinion, *Tilley v. Jessee*, 789 F.2d 1074, 14 C.B.C.2d 1376 (4th Cir.1986) reviewed the *Melichar* decision and narrowed the scope of that decision stating that "although the true intent of the parties rather than the labels attached or the application of state law controlled, we did not thereby preclude an examination of the written agreement as persuasive evidence of intent." *Id.* at 1379. The agreement in *Tilley* exhibited a structured drafting which dealt with the separate issues of property settlement and alimony in distinct sections of the document. *Id.* When the court found nothing in the record which supported a finding that the parties intended anything other than what was expressed in the written agreement, the court relied exclusively on the terms of the agreement. The court found that the payments entitled "Property Interest of Wife" were in fact a

property settlement and not alimony and thus, the debt was found to be dischargeable.

The agreement in question, like the agreement in the *Melichar* case, contains elements of both a property settlement and of an alimony agreement. The condition that Mr. Quinn's monthly payments would cease upon the death of either party is a characteristic of alimony payments. Presumably, Mrs. Shannon would not need any support after her death and Mr. Quinn could not provide any support after his death. However, the agreement also contained the condition that the payments were to continue only until October 1, 1994, whether or not the plaintiff remarried or either party had a change in status. The payments were also expressly non-modifiable. These two conditions are not normally found in an alimony agreement because presumably, the recipient spouse's needs could change upon remarriage, before or after any fixed termination date and the payee spouse's ability to pay could also change at any time. Thus, alimony payments which are usually based on one spouse's need and the other spouse's ability to pay are also usually modifiable.

The Quinn's agreement is a hybrid one and as the court held in *Melichar*, the non-alimony terms do not defeat characterization of the payments as alimony. They do allow the court to look beyond the labels and terms the parties have expressed in their written agreement. The terms contained in the Quinns' agreement unlike the terms of the Tilley agreement, do not conclusively show that the parties intended that the payments be for support nor do they show the parties intended them to be a property settlement. Thus, the court is not required to confine its determination of the parties' intent to the terms of the parties' final written agreement, as the *Tilley* court did.

Further support for the need to go beyond the document is found in the law of contracts. This agreement clearly states in one section that the "payments to wife shall not be considered alimony," and that they are considered as payments in settle-

ment of property rights. However, in the "Life Insurance" segment of the document, which directs the reader to the "Payments to Wife" section, the Payments are referred to as "Husband's cash *support* obligations" (emphasis added). Thus, the document is ambiguous. When a contract is unambiguous and it contains a merger clause, the parole evidence rule prohibits a court from looking at prior or contemporaneous negotiations to prove terms contrary to those in the document itself. Such is not the case with this agreement and thus, the court is free to examine all other evidence of the parties' intent.

### C. The Evidence Shows That The Parties Both Intended The Payments To Be Alimony Payments.

The Fourth Circuit held in *Tilley v. Jessee*, 789 F.2d 1074, 14 C.B.C.2d 1376 (4th Cir.1986) that *mutual* intent is the threshold question that must be crossed in a case which determines dischargeability under 523(a)(5). Once this court looks beyond the written agreement it finds clear and convincing evidence that both the parties intended the payments as support money for Mrs. Shannon.

#### 1. Mrs. Shannon's Intent

When Mrs. Shannon and Marshall Quinn were married, Mr. Quinn had a salary of approximately $100,000 a year. Mrs. Shannon worked for one year of their seven year marriage. Once the parties separated, Mrs. Shannon did not find work right away and the jobs she ultimately found paid $12,000 to $18,000 a year; a much lower income than she was accustomed to when living with Mr. Quinn. Mr. Quinn sent Mrs. Shannon some monthly support payments during the first year of their separation when Mrs. Shannon did not have a job and Mrs. Shannon testified that she used the money and loans from her family for her subsistence. In the letters and proposals that went back and forth between the parties during the period before the final agreement, Mrs. Shannon always referred to Mr. Quinn's payments as "support" or "alimony." She never wanted any part of the marital home and felt there was little or no equity to divide. The payments that are referred to in the final agreement are no different from the payments she received before the agreement. Mrs. Shannon intended that all the payments be for support and they were in fact used by her to support herself and her daughter.

#### 2. Mr. Quinn's Intent

Mr. Quinn testified that he never intended the payments in the final agreement to be characterized as alimony because "he did not believe in alimony for a former wife who has no minor children." However, in the letters and proposals that were sent back and forth between the parties and their lawyers, Mr. Quinn himself called the payments "alimony" (Plaintiff's Exhibit # 21). When Mrs. Shannon proposed a payment from Mr. Quinn to her of $500 a month "alimony," Mr. Quinn wrote, in reference to that paragraph, in a letter to his attorney, "Agreed." Mr. Quinn testified that during the time the parties were separated, but before the final agreement was signed, he gave Mrs. Shannon money "in order to help her out."

There is no evidence to show why Mr. Quinn would intend to help his wife out for a few months and then once the agreement was signed intend the payments as a property settlement. Further, there is no evidence whatsoever to show that the parties ever discussed a property settlement or that Mr. Quinn wanted the payments to be treated as such. Instead, the facts show that Mr. Quinn was uncooperative with Mrs. Shannon and refused to pay her until he realized that she would actually file suit and the allegations in her complaint would become public. It is clear that Mr. Quinn signed the agreement out of fear of his wife's accusations and not because the final agreement, which *Mrs. Shannon's* attorneys drafted, omitted the words alimony and support.

#### 3. The Payments Were Not Intended to Be A Property Settlement:

Mr. Quinn wants the court to believe that he intended the monthly payments to Mrs. Shannon as a property settlement. If the amount of the monthly payments until 1994 is totaled, the sum is approximately $48,-

000. However, Mr. Quinn's testimony indicates that there is very little equity in the home and the personal property of the parties was worth $30,000 at best. Thus, it seems very unlikely that Mr. Quinn would intend this as a property settlement when the parties did not have property worth $96,000 to divide.

### D. The Payments were Labeled "Property Settlement" in the Agreement Because the Parties did not want the Payments to be Modified.

Although it is clear to the court that Mrs. Shannon and Mr. Quinn intended the payments to be used as support for Mrs. Shannon, it is not quite as clear why Mrs. Shannon's attorneys took such pains to disguise the nature of these payments when they drafted the agreement. The payments are not called support payments and the agreement explicitly states that they are not modifiable. However, Mr. Kern, Mrs. Shannon's domestic law counsel, testified that a recent North Carolina family law decision held that a separation agreement, which was incorporated into a divorce judgment, may be modified with respect to its alimony provisions despite language in the agreement that prohibits modification without the consent of the parties. *Acosta v. Clark*, 70 N.C.App. 111, 318 S.E.2d 551 (1984).

Mr. Kern explained that although the parties intended the payments as support, they both wanted the payments to continue unchanged for a certain period of time. Thus, Mrs. Shannon's attorneys used labels to avoid the result in *Acosta*, and to allow the parties the certainty they both wanted. While the non-modifiability aspect makes the payments look somewhat unlike alimony, the Fourth Circuit in *Melichar* stated that "the hybrid nature of the agreement does not automatically destroy the nature of the payments as alimony." 661 F.2d at 303. The court is clearly convinced that despite the labels and non-modifiability aspect, the parties intended them as support and they are thus non-dischargeable.

## II. Mr. Quinn's Obligation to Tracy Quinn

Under the October 2, 1986, agreement between the parties, Mr. Quinn is also obligated to pay child support to Tracy Quinn, his adopted daughter. Because these payments are in the nature of support and are labeled as such, they are not dischargeable in bankruptcy. The terms of the agreement state, concerning Tracy's automobile, that "Husband shall continue to be responsible for and shall pay all monthly payments, insurance, taxes and other expenses associated with the vehicle until the note is paid in full." (p. 12). Further, Mr. Quinn is to pay all insurance premium payments until the note is paid unless Tracy is still in college, then he shall make all insurance premiums until she finishes college. Under the "Cash Child Support" heading, the agreement states that Husband shall pay Tracy $100.00 a month for her college expenses until she has completed her course of study, not to exceed four (4) years. Further, Mr. Quinn is to maintain health insurance for Tracy through his employer until she completes her college education.

It is clear from the agreement that Mr. Quinn is obligated to pay all monthly payments, insurance premiums and taxes on Tracy's car, whether or not she is enrolled in school. Mr. Quinn is also required to pay Tracy $100.00 a month for college expenses "until she completes her course of study." Tracy has withdrawn from school at this time but she has not completed her course of study. Thus, Mr. Quinn is not obligated to make the monthly payments to Tracy at this time, but is required to make them should Tracy return to school, and owes to her any past payments he did not make while Tracy was attending school. Mr. Quinn must also maintain health insurance coverage for Tracy during the time she is in school.

## III. Conclusion

This court finds that the October 2, 1986, agreement between the parties was unclear and ambiguous and thus the court is not limited in its investigation to that agreement alone. Therefore, the intent of the parties is controlling on the issue of wheth-

er certain payments from Marshall Quinn to Mrs. Shannon are in the nature of alimony and thus non-dischargeable under 523(a)(5). The testimony of the parties, the prior negotiations between the parties and the relative position of the parties all show that both Mr. Quinn and Mrs. Shannon intended the payments as support. The debt to Mrs. Shannon is not dischargeable as a result of Mr. Quinn's bankruptcy and he now owes her all past due monies as well as those continuing under the agreement. Mr. Quinn is also obligated to Tracy Quinn for past due child support and will be obligated to pay her monthly support if and when she returns to school.

It is therefore ORDERED that the debts are determined to be alimony and support payments and are non-dischargeable.