**In re David A. DAVIDSON, Debtor.**

**Nancy Y. DAVIDSON, Plaintiff,**

**v.**

**David A. DAVIDSON, Defendant.**

**Bankruptcy No. 388–31580 RCM–7.
Adv. No. 388–3468.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Aug. 28, 1989.

Rodney H. Lawson, Dallas, Tex., for plaintiff.

Reagan M. Martin, Dallas, Tex., for defendant.

## AMENDED MEMORANDUM OPINION

ROBERT McGUIRE, Chief Judge.

On May 17, 1989, the Court's original Memorandum Opinion was entered herein. No judgment has yet been entered thereon. Debtor timely filed a motion to amend findings of fact, conclusions of law, and memorandum in support thereof. Plaintiff likewise moved the Court to amend its findings to include allowance of appellate attorney fees. The Court hereby withdraws its original Memorandum Opinion and substitutes and amends same by filing the following in place thereof.

Pursuant to Bankruptcy Rule 7052, the following constitutes the Court's findings of fact and conclusions of law.

This is a core proceeding. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I). This case was tried March 22, April 10, and April 11, 1989. This case involves the dischargeability of certain obligations arising out of a marriage settlement agreement executed in conjunction with the parties' pending divorce.

Nancy Y. Davidson ("Plaintiff") and David A. Davidson ("Defendant") were

married to each other on September 9, 1977.

Defendant filed an original petition for divorce on December 7, 1982, and the parties were separated at or about that time. Plaintiff was twenty-four years of age at the time of marriage and twenty-eight years of age at the time of the divorce. The parties had no children.

On March 29, 1983, the parties entered into a Marriage Settlement Agreement (the "Agreement"). On March 30, 1983, the parties were granted a divorce pursuant to the entry of a decree of divorce.

In August, 1986, Defendant defaulted on his monthly payment obligations under paragraphs 8.01(A)(1) and (2) of the Agreement, and has failed to make any further Article VIII payments since that time. Articles 8.01(A)(1) and (2), 8.01(B) (first two paragraphs), and 8.05 read as follows:

8.01 *Periodic Payments.*

A. *Amount.* Husband contracts and agrees to pay with Wife, for her support and maintenance, periodic payments as follows:

1. The sum of $1,583 each and every month beginning on the 1st day of May, 1983 and continuing for one hundred twenty (120) subsequent months, payable on the first day of each month thereafter, for a total period of 121 months;

2. The sum of $6,149 each and every month beginning on the 1st day of May, 1983, and continuing for a total period of 121 months;

B. *Termination and Reduction.* The payments provided in Paragraphs 1 and 2 above shall continue until terminated in accordance with the earlier occurence [sic] of the following events: (1) death of Wife or (2) after the 121st payment.

The payments provided in Paragraphs 3, 4, 5 and 6 shall continue until terminated in accordance with the earlier occurence [sic] of (1) Wife's death, or (2) upon a sale of all of the property owned by The Stiles Office/Retain Joint Venture and the LBJ–Stemmons Joint Venture on or after April 1, 1983. The payments provided in paragraphs 3, 4, 5 and 6 shall

be reduced as more fully described herein.

8.05 *Intent to Pay Periodic Payments.* The support obligation of Husband embodied in the provisions of this Article VIII is unrelated to the division of marital property which is provided for in the other provisions of this Agreement and is not intended in any way to constitute a form of payment to Wife for any rights or interest she may have in the marital properties of the parties. This support obligation is contractual in nature and is not an obligation imposed by order or decree of court. Said obligation is undertaken by Husband in recognition of his general duty of support and because of the marital and family relationship of the parties, and also is in consideration of Wife's execution of this instrument. Support payments provided for herein shall not be modifiable by any court for any purpose whatsoever, and this provision constitutes an essential element and inducement for this integrated Marriage Settlement Agreement.

A spendthrift provision, at 8.06 in the Agreement, prohibited Plaintiff from anticipating the payments in question.

Although participating in some of the negotiations, the parties substantially delegated most of the negotiations to their attorneys. During the divorce negotiations, Defendant and his lawyers expressed an interest in finalizing the divorce as soon as possible by agreement, not by way of trial. Tom Goranson ("Goranson"), Plaintiff's attorney at the time, briefly advised Defendant and his counsel that, in addition to an equal division of the marital estate, Plaintiff needed an income stream to assure her of maintaining at least some semblance of her then lifestyle and because of the alleged intrinsic value of Defendant's superior earning capacity. This position of Goranson was termed a late surprise position by some of the witnesses. Plaintiff was not particularly happy about the timing of the divorce. Plaintiff felt her involvement in Defendant's business helped Defendant achieve the substantial financial

position he enjoyed at the time of the divorce.

The first four years of the parties' marriage were fairly meager from an economic standpoint. However, during the last two years of their marriage, the parties enjoyed a very good lifestyle. In 1982, Defendant's adjusted income from Davidson Real Estate was $513,000, and in 1983 he received over $1.1 million from Davidson Real Estate Company. Goranson characterized the parties' lifestyle as a high-flying "James Bond-type" lifestyle where the parties lived extravagantly, and traveled extensively.

There was no testimony showing that, at the time of entering into the Agreement, either the parties or their attorneys were contemplating the possible effect of bankruptcy upon the terms of the Agreement. However, paragraph 10.3 of the Agreement expressly refers to attorney fees being awarded if rights have to be enforced through the Bankruptcy Court.

Plaintiff advised Goranson that she had concern about her financial future and need of a future income stream to ensure she maintained at least some semblance of her then lifestyle.

Although Plaintiff was twenty-eight years of age at the divorce, she was not a college graduate, her future earning capacity was very uncertain and for the most part was limited to the income provided in the Agreement, or income from properties she obtained as a result of the Agreement. While married, Plaintiff had an earning capacity with the Defendant's business. Aside from the alleged "alimony", Plaintiff had some oil income allocated at the time of the divorce and obtained substantial properties as a result of the Agreement. Plaintiff had limited business experience in comparison to Defendant. (Defendant estimated that, excluding alleged "alimony", Plaintiff received approximately $1 million in value within one year of the divorce.)

If you add the Article 8.01(A)(1) and (2) payments, then Defendant contends that Plaintiff received more than fifty percent of the property values in the marriage. This was credible. There was testimony from Mr. Rothwell ("Rothwell"), Defendant's accountant, that, counting alimony Plaintiff received, she received 55% and Defendant received 45% of the parties' property. Some authority exists for the proposition that when there is unequal division in favor of the wife, at least a portion of such unequal division is arguably support. *Smith v. Smith*, 97 B.R. 326 (Bankr. N.D.Tex.1989).

In *Bunch v. McCartt*, 3 Tex.Bkr.Rep. 68 (1989) (Bankr.N.D.Tex.1988), the husband, as in this case, contended that the interest that the wife received from certain property of the estate was sufficient to provide her with support, and, therefore, she did not need alimony. In rejecting that argument, the court noted that the wife's only other means of support was a small trust fund set up by her father. The court further noted that such argument did not take into account the fact that the alimony expired in fifteen years (in this case, ten years). The court further stated:

> ... It is only logical that her share of the community property should be available to take care of emergencies, a conclusion which is bolstered by McCartt's subsequent failure to pay the alimony or make the note payments.

*Bunch v. McCartt*, 3 Tex.Bkr.Rep. at 70. The *McCartt* court's observation is not as compelling in the circumstances of this case, where the Plaintiff received such a large amount of property.

There was never any specific written agreement to the effect that alimony would be paid to Plaintiff in consideration, in whole or in part, for her fifty percent undivided interest in Davidson Real Estate Company, or that alimony would be paid to Plaintiff as consideration, in whole or in part, for any other asset of the marital assets. As to 8.01(A)(2), the evidence does not show a specific express "meeting of the minds" between the parties regarding an exchange of alimony for property. The Stock Redemption Agreement (part of Defendant's Ex. 1) purportedly reflects the consideration agreed to in writing by the parties, and received by Plaintiff, for her interest in Davidson Real Estate Company. No side express oral agreements between

the parties reflect otherwise. Any other agreement has to be implied from the conduct of the parties, negotiating positions, circumstances existing, and an analysis of the twelve factors mentioned hereafter. As stated in *In re Voss,* 20 B.R. 598 (Bankr.N.D.Iowa 1982), intent may be deduced from surrounding circumstances. See also, *In re Fox,* 5 B.R. 317 (Bankr.N.D. Tex.1980).

At the time of the divorce, Plaintiff was a beneficiary of a trust from her father, but had never received substantial distributions from it. The existence of such trust did not affect the negotiating positions of the parties.

No explicit agreement existed to use the money in Paragraphs 8.01(A)(1) and (2) for anything other than Plaintiff's support.

During the trial, the specific amounts provided for in the Agreement were called into question. Defendant contended that the $1,583 figure in 8.01(A)(1) was attributable to Plaintiff's share of the pension profit sharing plan in Davidson Real Estate Company (See Defendant's Ex. 2). Defendant initially contended that the $6,149 in 8.01(A)(2) was attributable, at least in part, to a particular transaction called the Ashmont–Tomlin transaction, to wit: $4,542 for Plaintiff's share out of the future income from the Ashmont–Tomlin transaction and $1,607 either for another asset or for Plaintiff's taxes (Defendant's Ex. 2. Testimony showed that "P.V.", as used therein, meant "present value"). Defendant's Ex. 2 came from the file of Tina Soloman, one of Defendant's divorce counsel. The Ashmont–Tomlin transaction was a future commission pay out asset in Davidson Real Estate (See Plaintiff's Ex. 37). Defendant further contended that the $6,149 was an attempt to assign a present value to certain future income of Davidson Real Estate and produce a monthly payment which would compensate Plaintiff for her one-half share of that asset. Defendant further contended that the unusual odd dollar amounts, to wit, $1,583 and $6,149 in 8.01(A)(1) and (2) tended to show specific property allocations. Rothwell had suggested alimony treatment of this item of property. It was

Defendant's contention that the purpose of 8.01(a)(1) and (2) was to maximize the parties' tax advantages and provide Plaintiff with periodic cash payments in exchange for marital property that lacked liquidity.

Mr. Feldman, one of Defendant's divorce attorneys, recalls various numbers being tossed about during negotiations, internally and with Plaintiff's divorce counsel, and that they were generally tied to assets. This was credible testimony. He did not recall how 8.01(A)(1) and (2) were tied into specific assets.

In trial testimony, Rothwell initially tied in the $1,583 with the pension profit sharing plan, but then testified he did not know how the parties arrived at the specific 8.01(A)(1) and (2) numbers since he was not present at the last negotiating sessions. The tie-in of $1,583 as payment for Plaintiff's share of the profit sharing plan was cumulatively shown to be credible testimony. Rothwell and Mrs. Solomon ("Solomon"), another one of Defendant's divorce attorneys, testified that divorce counsel frequently use "alimony" as a word of art in marriage settlement agreements to shift tax incidents in the course of transferring property between the parties. They contended that it is not unusual to convert nondeductible assets into alimony for tax reasons. This was credible.

Solomon said negotiation discussions internally and with opposing counsel about numbers related to assets, but she conceded that, at her deposition, she testified that Goranson asked for additional money for alimony for Plaintiff to maintain her lifestyle. She testified that, during negotiations, there was no disagreement over the assets the parties were arguing about— there was just disagreement over value. Goranson testified that there was attorney disagreement over the value of assets of the parties. Solomon testified she never saw any support figures on Plaintiff during the negotiations. This was credible.

Defendant's Ex. 2 lists one negotiating area of concern as:

"D. Must generate enough cash for Nancy to live close to style to

which she is accustomed (and also equivalent to her net worth?)"

Another paragraph of Defendant's Ex. 2 contains in handwriting beside it "lifestyle income". However, such wording is beside paragraph C, additional alimony, which appears to relate to paragraphs 8.01(A)(3), (4), (5), and (6) (See 8.01(B)). There is no dispute that the conditions for termination of payments under paragraphs 8.01(a)(3), (4), (5), and (6) have occurred.

Solomon contended that the alimony figures were tied to the parties' assets. She stated that, during the negotiations, the payments were referred to as alimony. In her letter of September 20, 1983 to Goranson, she referred to the payments in 8.01(A)(1) and (2) as "alimony".

■ Goranson, who is board certified in family law, testified that the negotiations were unusual because of their speed. He testified that he took issue with the property valuations put forth by Defendant's representatives. Goranson testified that some of the attorney notes may have been used by Defendant's counsel to convince Defendant to pay larger sums. Internal negotiating discussions between a debtor and his divorce counsel, standing alone, are not of substantial probative value on the issue in question. *In re Daviau*, 16 B.R. 421, 425 (Bankr.D.Mass.1982). He further testified (and it is credible) that, in a short term marriage, it is somewhat unusual to have alimony. The parties did not go through the usual divorce discovery. He further testified that no one conveyed to him during negotiations that the income stream provided for in 8.01(A)(1) and (2) was in exchange for specific assets. Goranson testified that Defendant's Ex. 2 came from Solomon's offices. He testified that his client wanted $10,000 per month. The figures in 8.01(A)(1) through 8.01(A)(6) totalled $25,516 per month.

Pursuant to the terms of the Agreement, Defendant deducted all monthly payments under Article VIII of the Agreement as "alimony" on his individual income tax return, for the years 1983—1986. Pursuant to the terms of the Agreement, Plaintiff reported all monthly payments received under Article VIII of the Agreement as "alimony" income on her individual income tax return, for the years 1983—1986.

Defendant, individually or through duly authorized agents, also labeled his Article VIII post divorce check payments "alimony". Thirty-five checks offered into evidence contained this handwritten "alimony" notation.

The payments provided for in Article VIII of the Agreement were referred to by the parties and their respective counsel as "alimony", without any qualifier, until approximately August, 1988. Post divorce and up until Defendant's default in August, 1986, neither Defendant nor any of his attorneys or representatives ever indicated, in any way, to Plaintiff or Goranson that these article VIII payments were anything but alimony for all purposes or that these Article VIII payments were actually a part of the division of property of the marital estate.

■ While Plaintiff has been prejudiced to some extent by reporting payments as alimony on her tax returns, paying taxes thereon and now being unable to seek a complete refund thereon, under current case law, such prejudice appears to be only one of the factors to be cumulatively considered by the Court in cases of this nature. As stated in *In re Goodman*, 55 B.R. 32, 36 (Bankr.D.S.C.1985):

> ... In determining nondischargeability under Section 523(a)(5)(B), courts recognize that parties sometimes treat payments under a divorce settlement as one thing for tax purposes, while the true purpose of the payment is something else....

Furthermore, as found herein, the credible circumstantial evidence is that the essence of the following 8.01 payments was intended by the parties as property equalization payments, notwithstanding survivorship language;

| Paragraph | Amount |
|---|---|
| 8.01(1A)(1) | $ 1,583 per month |
| 8.01(A)(3) | 5,784 per month |
| 8.01(A)(4) | 4,000 per month |
| 8.01(A)(5) | 4,000 per month |
| 8.01(A)(6) | 4,000 per month |
| TOTAL | $19,367 |

(The payment that is in remaining issue in this opinion is the $6,149 payment provided in paragraph 8.01(A)(2). The monthly payments to Plaintiff in paragraph 8, including the $6,149, total $25,516).

■ As *In re Nunnally*, 506 F.2d 1024 (5th Cir.1975) holds, the Court is required to go beyond the characterization placed on the Agreement by the parties and examine the substance of the Agreement. The ultimate issue is whether the "alimony" obligation or a portion thereof was intended by the parties as equalization of property rights or support and maintenance. *In re Billingsley*, 93 B.R. 476 (Bankr.N.D.Tex. 1987); *In re Fox*, 5 B.R. 317 (Bankr.N.D. Tex.1970). Various factors have been listed by the courts to arrive at a determination of the intent of the parties. These factors include: [In brackets following each factor, this Court finds whether each such factor gravitates toward support or property equalization in this case].

A. The length of the marriage. [Property equalization]

B. Whether there are minor children in the care of the creditor spouse. [Property equalization]

C. The parties' standard of living during marriage. [Partially support]

D. Whether the creditor spouse had shown, at the time of the divorce, a need for support. Whether the former spouse was shown, at the time of the divorce, to have suffered in the job market, or was otherwise disadvantaged because of any dependent position held in relation to the debtor during the marriage. [Generally support, except for the substantial property received as part of the Agreement]

E. The financial resources of each spouse, including income from employment or elsewhere. [If Plaintiff's legitimate share of the marital assets are counted, this factor gravitates toward property equalization]

F. Whether the payments were made periodically, or over an extended period, or in a lump sum. [Support]

G. Whether payments were fashioned in order to balance the disparate income of the parties. [This is part of the ultimate issue in this case. However, when five of the six "alimony" amounts in paragraph 8 are specifically found to be property equalization, this factor gravitates toward 8.01(A)(2) likewise being fashioned for property equalization purposes]

H. The ages, health, work skills, and educational level of the parties. [Support]

I. Whether the terms of the settlement agreement indicated that the agreement was support, rather than property division. [Support]

*In re Billingsley*, 93 B.R. at 477. Under this analysis, a number of the foregoing factors would gravitate to support as opposed to property characterization with respect to the alleged "alimony" in question.

*In re Coffman*, 52 B.R. 667 (Bankr.D.Md. 1985), lists eighteen factors for the court to consider in ascertaining intent, most of which are subsumed in the above nine factors. However, prominent additional factors mentioned by that court are:

4. Whether debtor's obligation terminates upon death or remarriage of the spouse or a certain age of the children or any other contingency such as a change in circumstances. [Support]

\* \* \* \* \* \*

16. The circumstances contributing to the estrangement of the parties. [Support]

17. Whether the debt is for a past or future obligation, *any* property division, or any allocation of debt between the parties. [Property equalization]

*Id.*, at 674–675, (emphasis added). As pointed out in *In re Elder*, 48 B.R. 414, 417 (Bankr.W.D.Ky.1985):

... The presence of one or more of these factors does not necessarily mean the obligation is one of support nor does the absence of one or more indicate the award is part of a property settlement. Determination of whether support or a

property settlement is involved must be made on a case by case basis.

Thus, mechanically adding and subtracting the factors would not substitute for examination of the totality of the circumstances and placement of burden of proof in a particular case. Many of these factors have been previously discussed in the course of this opinion. *Also see, Matter of Benich,* 811 F.2d 943 (5th Cir.1987); *Roberts v. Poole,* 80 B.R. 81 (D.N.D.Tex.1987); *In re Bell,* 61 B.R. 171 (Bankr.S.D.Tex. 1986); *Yeates v. Yeates,* 807 F.2d 874 (10th Cir.1986); *In re Williams,* 703 F.2d 1055 (8th Cir.1983); *In re Spong,* 661 F.2d 6 (2nd Cir.1981); *Matter of Woods,* 561 F.2d 27 (7th Cir.1977); Ravin & Rosen, *The Dischargeability in Bankruptcy of Alimony, Maintenance & Support Obligations,* 60 Am.Bankr.L.J. (Winter 1986) ("60 AMLJ"); *Obligation Under Property Settlement Agreement Between Spouses As Dischargeable in Bankruptcy,* 71 ALR2d 758; Norton Bankruptcy Law & Practice § 27.56.

■ The fact that the payments terminate upon the death of the wife is a strong indication that they are for personal benefit and not a division of property. *Roberts v. Poole,* 80 B.R. at 84. A division of property would not normally terminate upon the wife's death. *Bunch v. McCartt,* 3 Tex. Bkr.Rep. at 68. *Also, Shaver v. Shaver,* 27 B.R. 452 (Bankr.D.Nev.1983) *aff'd.,* 40 B.R. 964 (D.Nev.1983) *aff'd.* 736 F.2d 1314 (9th Cir.1984); *Adler v. Nicholas,* 381 F.2d 168 (5th Cir.1967). As stated by the Bankruptcy Court in *Shaver v. Shaver,* 27 B.R. at 455, "It is difficult to imagine a true property division terminating upon the death of one of the spouses." As stated in *Yarus v. Yarus,* 178 Cal.App.2d 190, 3 Cal.Rptr. 50, 58 (1960), the mere fact that the payments will terminate on the wife's remarriage or death is not solely determinative that the payments constitute alimony, support, or maintenance if the manifest intentions of the parties appear to the contrary. As previously discussed, the Court has initially found that five of the six payments in paragraph 8, notwithstanding survivorship language, were for property equalization, as opposed to support.

As stated in 60 ABLJ *supra* at 8:

A minority of federal courts have given primary consideration to the form of the obligation. Under this approach, the court compares the debt at hand with the characteristics of support orders under local law. For example, the court may look at whether the obligation terminates on the death or remarriage of the recipient spouse, whether the obligation terminates on the death of the donor spouse and whether the payments are payable in installments or over a substantial period of time.

Under the majority approach, the bankruptcy court will seek to ascertain the intent of the parties as deduced from the divorce agreement and other surrounding circumstances.

In the absence of clear intent, it may be necessary to refer to various factors present at the time the debt was incurred. The factors which will be examined generally parallel those that a divorce court might consider in originally deciding whether to award support or alimony.

\* \* \* \* \* \*

Since the appropriate inquiry is into the underlying purpose of the debt, to wit, whether the debt was in lieu of the payment of alimony or support or was only a means of dividing property, the court's inquiry will often go beyond the face of the separation agreement or state court judgment.

■ Even if Defendant's representatives had Defendant's tax advantages in mind in structuring the Agreement from his standpoint, if the Plaintiff died one year after entry of this Agreement, (which may have been a remote actuarial contingency), Plaintiff's estate still would have forfeited all rights to future consideration. The bargained-for value of this contingency and the bargained-for value to the Defendant of these deductions and shifting of taxes cannot be totally ignored when ascertaining the parties' intent on March 29, 1983. *Bunch v. McCartt, supra; Shaver v. Shav-*

*er,* 27 B.R. at 452. Defendant's possible future financial plight, while likewise remote when the contract was entered into, and not openly discussed by the parties, was still a legitimate contingency when the Agreement was entered into. See Paragraph 10.3 of the Agreement.

■ An additional sub issue in evaluating intent at the time of the transaction could be whether, at the time of the Agreement, the amount of the alimony allotted was so excessive as to be unreasonable under traditional concepts of support. *In re Calhoun,* 715 F.2d 1103 (6th Cir.1983).[1] If so, then this could be an indication that the "alimony" really was intended as property equalization rather than support. In view of the parties' "James Bond extravagant lifestyle" at the time of entry of the Agreement, the amounts in paragraphs 8.01(A)(1) and (2) totalling $7,732, if evaluated separately, would not be so excessive, even though under ordinary circumstances between ordinary parties, such sums would be excessive. They would be excessive if jointly considered with (A)(3) through (A)(6). The total of the monthly payments in Paragraph 8 is $25,516. From the testimony, the alimony amounts set forth in paragraphs 8.01(A)(3), (4), (5), and (6), which are not involved in this case because they have been previously paid or terminated by their own terms, are found to be in the nature of property equalization as opposed to true alimony support, even though likewise characterized in the Agreement as alimony. Such other payments are only involved in the sense of attempting to determine by circumstantial evidence the intent of the parties with respect to 8.01(A)(1) and (2). Such paragraphs have different termination conditions and are treated differently elsewhere in the Agreement.

■ An additional issue for consideration is whether the Court should consider the Defendant's changed circumstances existing at date of trial. A few courts balance the need for continued support against the debtor's need to gain a fresh start. *See, In re Calhoun,* 715 F.2d at 1110 n. 11; *contra, In re Bell,* 61 B.R. at 176 nn. 8 and 9; *Smith v. Smith, supra; In re Harrell,* 754 F.2d 902 (11th Cir.1985); *Forsdick v. Turgeon,* 812 F.2d 801 (2nd Cir.1987). This Court agrees with the majority of courts holding that the court may not consider debtor's financial condition at the time of the bankruptcy.

■ Upon reconsideration, the issue of whether the $6,149 in 8.01(a)(2) of the property settlement Agreement was intended as property equalization or support appears to boil down to a burden of proof issue in this case. Plaintiff concedes that she has the initial burden of proof to establish that the payments were in the nature of alimony, maintenance or support. However, Plaintiff contends that once she has made out a *prima facie* case, the burden shifts to Defendant to establish his entitlement to discharge of the debt by showing that these payments are really part of the division of property. Citing *In re Voss,* 20 B.R. 598, 601 (Bankr.N.D.Iowa 1982); *In re Daviau,* 16 B.R. 421, 424 (Bankr.D.Mass.1982); *In re Ingram,* 5 B.R. 232, 234 (Bankr.N.D.Ga. 1980); *In re Smith,* 436 F.Supp. 469, 477–478 (N.D.Ga.1977). The cases cited state that, once the *prima facie* case is made out, the burden shifts to the debtor to establish his continuing right to a discharge of the debt. The seminal case statement appears in the 1977 opinion in *In re Smith, supra,* 436 F.Supp. 469, 477–478. However, the *Smith* opinion was an Act case. In Norton's Bankruptcy Law & Practice, Bankruptcy Rules 1987–88 ed. at 264, the editorial comments under Bankruptcy Rule 4005 are as follows:

Rule 4005 is identical to former Rule 407 and states the basic rule governing the burden of proof in adversary proceedings involving a complaint objecting to an individual debtor's discharge under Code § 727. This Rule provides that the burden of proof is on the objecting trustee or creditor who filed the complaint.

---

1. There is a danger that such an analysis would embroil the Court improperly in State Court matters. *Smith v. Smith, supra.*

*Under § 14c of the former Bankruptcy Act the procedure was otherwise. The objector merely had to satisfy the Court that reasonable grounds existed for believing that the debtor committed any of the acts which would bar a discharge. Upon such a showing, the burden of proof shifted to the debtor, who then had to establish that the acts complained of had not been committed.*

As indicated in the Advisory Committee Note, this Rule does not purport to address the initial procedural issue as to the establishment of a prima facie case or the duty of going forward with the evidence. Moreover, this Rule does not express the nature of the proof that will satisfy the burden of persuasion, i.e., by a preponderance of the credible evidence or by clear and convincing proof. Nor does this Rule prescribe when the burden of going forward shifts to the defendant. Rule 4005 simply declares that regardless of whether or not the burden of going forward with the evidence shifts at any time to the debtor, the plaintiff *always* bears the burden of ultimate persuasion as to the denial of a discharge throughout the entire adversary proceeding.

(Emphasis added).

The Advisory Committee note under Bankruptcy Rule 4005 states as follows:
... This rule does not address the burden of going forward with the evidence. Subject to the allocation by the rule of the initial burden of producing evidence and the ultimate burden of persuasion, the rule leaves to the courts the formulation of rules governing the shift of the burden of going forward with the evidence in the light of considerations such as the difficulty of proving the nonexistence of a fact and of establishing a fact as to which the evidence is likely to be more accessible to the debtor than to the objector. See, e.g., *In re Haggerty*, 165 F.2d 977, 979–80 (2d Cir.1948); *Federal Provision Co. v. Ershowsky*, 94 F.2d 574, 575 (2d Cir.1938); *In re Riceputo*, 41 F.Supp. 926, 927–28 (E.D.N.Y. 1941).

Courts frequently discuss Bankruptcy Rule 4005 as establishing the burden of proof on plaintiff under 11 U.S.C. § 523. *In re Quinn*, 97 B.R. 837 (Bankr.W.D.N.C. 1988); *In re Long*, 794 F.2d 928 (4th Cir. 1986); *In re Leupp*, 73 B.R. 33 (Bankr.N.D. Ohio 1987); *In re Doe*, 93 B.R. 608 (Bankr. W.D.Tenn.1988). However, such bankruptcy rule has to do with objections to discharge under 11 U.S.C. § 727. In 60 ABLJ, *supra* at 29, n. 124, it is stated:
Literally, Rule 4005 only applies to *objections* to a discharge under sections 727, 1141(d) and 1328. However, it is also applied by the courts to *exceptions* to discharge under section 523.
(Emphasis added). While not critical to this opinion, it appears that, in certain factual scenarios, there are different policy considerations under § 727 than under some portions of § 523, thereby making the Advisory Committee note on shifting of the burden of going forward questionable in certain instances under § 523. For example, it makes policy sense to shift the burden of going forward to the debtor after establishment of a *prima facie* case on unexplained loss of assets under § 727(a)(5) and possibly under § 523(a)(2)(B), but the same policy grounds would not appear applicable under § 523(a)(5).

Even under 11 U.S.C. § 727 and Bankruptcy Rule 4005, the creditor has the ultimate burden of persuasion. *Matter of Reed*, 700 F.2d 986, 992 (5th Cir.1983); *In re Montgomery*, 86 B.R. 948 (Bankr.N.D. Ind.1988); *In re Brooks*, 58 B.R. 462 (Bankr.W.D.Pa.1986); *In re Martin*, 698 F.2d 883 (7th Cir.1982).

Furthermore, it is clear, under the case law, that a plaintiff under § 523 has the burden of proof. *In re Lineberry*, 55 B.R. 510, 514 (Bankr.W.D.Ky.1985); *In re Calhoun*, 715 F.2d 1103, 1111 (6th Cir.1983); *In re Elder*, 48 B.R. 414, 416 (Bankr.W.D. Ky.1985).

The Court finds that Plaintiff has the ultimate burden of persuasion as to the $6,149 to show that such payment or part thereof was in the nature of support. Plaintiff failed to meet this burden of persuasion. While Plaintiff established a *pri-*

*ma facie* case that the $6,149 was for support, the *prima facie* case was met or rebutted by Defendant and Plaintiff did not meet *her* ultimate burden of persuasion that the $6,149 was intended for support as opposed to property equalization.[2] It is respectfully suggested that to place the ultimate burden of persuasion with respect to the $6,149 upon the Defendant improperly shifts the burden of proof to the Defendant. *In re Calhoun,* 715 F.2d 1103 (6th Cir.1983). Also see *Melichar v. Ost,* 7 B.R. 951, 962 (D.Md.1980), specifically disagreeing with *Smith* at p. 963. The ultimate burden of persuasion, not merely the initial burden of producing evidence, remains on the objector. *Id.* at 963–964 stating:

With deference, this Court disagrees with the application of Rule 407 in *Smith.* As indicated *supra,* the Advisory Committee Note to Rule 407 specifically states that the rule was intended to supersede the earlier interpretation of the proviso at the end of section 14(c), *i.e.,* the former interpretation of the statute which required the objector to make merely a *prima facie* showing that the bankrupt was not entitled to discharge, with the burden of proof then shifting to the bankrupt. Under present Rule 407, by contrast, the ultimate burden of persuasion, not merely the initial burden of producing evidence, remains on the objector. It is to be noted that two of the cases cited by the District Court in *Smith,* namely, *In re KDI Corp.,* 477 F.2d 742 (6th Cir.1973), and *Feldenstein v. Radio Distributing Co.,* 323 F.2d 892 (6th Cir.1963), were decided prior to the enactment of Rule 407. Indeed, the *Feldenstein* decision was cited in the Advisory Committee's Note to Rule 407 as one of the cases setting forth the interpretation of the section 14(c) proviso which was superseded by the promulgation of Rule 407.

Accordingly, this Court interprets Rule 407 as imposing upon the plaintiff-wife the burden of proving by a preponderance of the evidence that the obligations in paragraph 8 of the MSA were in the nature of alimony payments and were, therefore, nondischargeable in bankruptcy. . . .

The Court finds that, from the March, 1983 intent of the parties that can be ascertained, the 8.01(A)(1) payment of $1,583 per month was intended by the parties as payment for Plaintiff's interest in the pension profit sharing plan and therefore is dischargeable. The evidence appears clearer that such sum was in payment for a specific asset, whereas with respect to the $6,149 figure attempts to link same to a particular asset or to support are more difficult, such number being the result of a potpourri of conflicting demands.

The Court has previously found that Plaintiff has not met her ultimate burden of persuasion as to the $6,149. Further, the Court finds that essentially (*In re Fox, supra,* 5 B.R. at 320) the $6,149 was intended by the parties for property equalization even if specific asset linkage is difficult. While the Court appears to have a duty to quantify any portion of such $6,149 that was intended by the parties for support (*In re Fox, supra,* 5 B.R. at 320), Plaintiff's proof did not prove any support quantification figure. Property equalization intent for the figures in 8.01(A)(1), (3), (4), (5), and (6) is some circumstantial evidence of property equalization intent on 8.01(A)(2).

The overall atmosphere of the divorce negotiations was controlled by the Defendant's anxiety for a prompt settlement and divorce. The parties were engaged in basically friendly, semi-hardnosed negotiations. The parties' negotiating positions were that both sides' representatives had the normal objectives of obtaining maximum benefits for their respective clients regardless of how the benefits and values were characterized or valued by the opposition. The Agreement reached was fair, with no overreaching or dissatisfaction or disagreement on either side until the payment characterization became important for bankruptcy purposes.

---

**2.** For a discussion of the procedure in shifting the burden of going forward and rebuttal of a *prima facie* case, see *McDonnell Douglas Corp.* *v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *In re Martin, supra,* 698 F.2d 883, 887.

These are difficult cases from both sides. There are legitimate issues that need to be tried. In the process of trial, the parties have to dig up and relive painful memories. Furthermore, many times the parties in this Court, because of the nature of the issues, take positions which may or may not be consistent with divorce court positions. The courts have to sift through these positions and the prior status as relived many years later to determine the ultimate issue, to wit: 'the reality of the nature of the payments' as described in *Matter of Benich*, 811 F.2d 943, 945 (5th Cir.1987). *See also, Forsdick v. Turgeon*, 812 F.2d 801 (2nd Cir.1987), CCH Bankruptcy Law Reports ¶ 71720.

*In re Billingsley, supra,* 93 B.R. 476, 477.

Judgment will be entered in accordance with the foregoing opinion. All pending requests for amended findings of fact or conclusions of law, except as granted herein, are denied.